The STATE OF CALIFORNIA, acting By and Through Governor Edmund G. BROWN, Jr., the California Coastal Commission, the California Air Resources Board, the California Resources Agency, the California Department of Fish and Game, the California Department of Conservation, Plaintiffs,

v.

James G. WATT as Secretary of the Interior; the United States Department of Interior; Edward Hastey as Acting Director of the United States Bureau of Land Management; Robert Burford as Director Designate of the United States Bureau of Land Management, in his official capacity as Director when and if assumed; and the United States Bureau of Land Management, Defendants.

NATURAL RESOURCES DEFENSE COUNCIL, INC.; the Sierra Club; Friends of the Earth; Friends of the Sea Otter; and the Environmental Coalition on Lease Sale 53, Plaintiffs,

v.

James G. WATT, in his official capacity as Secretary of the United States Department of the Interior; the United States Department of the Interior; Ed Hastey, in his official capacity as Acting Director of the United States Bureau of Land Management; Robert Burford, Director-Designate of the United States Bureau of Land Management, in his official capacity as Director when and if assumed; and the United States Bureau of Land Management, Defendants.

Nos. CV 81–2080, CV 81–2081.

United States District Court,
C. D. California.

Aug. 18, 1981.

George Deukmejian, Atty. Gen., N. Gregory Taylor, Asst. Atty. Gen., Theodora Berger and John A. Saurenman, Deputy Attys. Gen., Los Angeles, Cal., for plaintiffs State of California, acting by and through Governor Edmund G. Brown, Jr., the California Coastal Commission, the California Air Resources Board, the California Resources Agency, the California Department of Fish and Game, and the California Department of Conservation.

Carol E. Dinkins, Asst. Atty. Gen., Michael W. Reed, Peter R. Steenland, and Anne S. Almy, Attys., U.S. Dept. of Justice, Washington, D.C., Andrea Sheridan Ordin, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civ. Div., and James R. Arnold, Asst. U.S. Atty., Los Angeles, Cal., for defendants James G. Watt, as Secretary of the Interior; the United States Department of the Interior; Edward Hastey as Acting Director of the United States Bureau of Land Management; Robert Burford as Director Designate of the United States Bureau of Land Management, in his official capacity as Director when and if assumed; and the United States Bureau of Land Management, in both cases.

E. Edward Bruce, Covington & Burling, Washington, D. C., for defendants in intervention ("WOGA") Western Oil and Gas Association, Atlantic Richfield Co., Chevron, U. S. A. Inc., Cities Service Co., Exxon Co., U. S. A., Getty Oil Co., Gulf Oil Corp., Mobil Oil Corp., Phillips Petroleum Co., Shell Oil Co., Sohio Petroleum Co., Tenneco Oil Co., and Texaco, Inc., in both cases.

Howard J. Privett, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., William

C. Miller and Donald E. Peterson, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant in intervention Chevron, U. S. A., Inc., in both cases.

Donatas Januta, Irwin D. Karp, Boyd, Januta & Karp, San Francisco, Cal., for plaintiffs in intervention, Local Governments, County of Humboldt, County of Marin, County of Mendocino, County of Monterey, County of San Luis Obispo, County of San Mateo, County of Santa Barbara, County of Santa Clara, County of Santa Cruz, County of Sonoma, City of Brisbane, City of Los Angeles, City of San Luis Obispo, City of Santa Cruz, City of Santa Monica and City of Seaside, in both cases.

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, Phillip L. Kossy, Deputy County Counsel, San Diego, Cal., for plaintiff in intervention County of San Diego, in both cases.

Trent W. Orr, Natural Resources Defense Council, Inc., San Francisco, Cal., Julie E. McDonald, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., for plaintiffs Natural Resources Defense Council, Inc., the Sierra Club, Friends of the Earth, Friends of the Sea Otter and the Environmental Coalition on Lease Sale 53, in both cases.

## OPINION

PFAELZER, District Judge.

## I. BACKGROUND

Plaintiffs in this case are the State of California, the California Coastal Commission (hereinafter referred to as "CCC"), the California Air Resources Board, the California Resources Agency, the California Department of Fish and Game, and the California Department of Conservation. (This case is hereinafter referred to as *California v. Watt.*) The Natural Resources Defense Council, Inc. (hereinafter referred to as "NRDC"), the Sierra Club, the Friends of the Earth, the Friends of the Sea Otter, and the Environmental Coalition on Lease Sale 53 (hereinafter collectively referred to as "environmental groups") are plaintiffs in the companion case. The plaintiffs in the companion case are associations who claim an interest in the coastal zone and its resources. (The companion case is hereinafter referred to as *NRDC v. Watt.*)

Intervening as plaintiffs in the case of *California v. Watt* are certain cities and counties of the State of California which are located on, or in proximity to, the California coast. The plaintiff-intervenors are County of Humboldt, County of Marin, County of Mendocino, County of Monterey, County of San Diego, County of San Luis Obispo, County of San Mateo, County of Santa Barbara, County of Santa Clara, County of Santa Cruz, County of Sonoma, City of Brisbane, City of Los Angeles, City of San Luis Obispo, City of Santa Cruz, City of Santa Monica, and City of Seaside (collectively referred to as "local governments").

The defendants are James G. Watt (the "Secretary"), acting in his official capacity as Secretary of the Interior, the Department of Interior, Robert Burford, acting in his official capacity as Director of the Bureau of Land Management, and the Bureau of Land Management ("BLM").

Intervening as defendants in both actions are Western Oil and Gas Association ("WOGA"), Amoco Production Company, Atlantic Richfield Company, Cities Service Company, Conoco, Inc., Exxon Corporation, Elf Aquitaine Oil and Gas, Getty Oil Company, Gulf Oil Corporation, Phillips Petroleum Company, and Shell Oil Company. WOGA is a regional trade association of companies and individuals in the petroleum industry. The remaining defendant-intervenors are oil companies which submitted high bids on one or more tracts offered in Lease Sale No. 53 on May 28, 1981.

Lease Sale No. 53 consists of a maximum offering of 243 designated tracts of the Outer Continental Shelf ("OCS") for mineral development. The tracts in Lease Sale No. 53 lie in five different basins off the coast of California—one of which is the Santa Maria Basin. That basin extends generally from Point Sur in Monterey County in the north to Point Conception in Santa Barbara County in the south.

■ Requesting injunctive and declaratory relief, plaintiffs claim that defendants have violated five federal statutes in offering for competitive bidding certain oil and gas leases on tracts located in the Santa Maria Basin. This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction); 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act); 28 U.S.C. § 1361 (Mandamus); 5 U.S.C. §§ 701–706 (Administrative Procedure Act); 43 U.S.C. §§ 1349(a)(1), (b)(1) of the Outer Continental Shelf Lands Act ("OCSLA"); the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(a)(1), (b)(1); and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*

There are no material issues of genuine fact in dispute in these two consolidated cases.

The following is a chronology of the events relating to the lease sale at issue in the two cases.

In November 1977, BLM issued a Call for Nominations for Lease Sale No. 53. The Call requested the petroleum industry to designate specific tracts on which it was interested in bidding if a sale were held. It also asked federal, state and local governments, universities, environmental organizations, research institutions, and the public to identify specific tracts which they believe should be excluded from leasing or should be leased under particular restrictions due to conflicting resource values or environmental factors.

In October 1978, the Department of Interior announced the tentative tract selection for Lease Sale No. 53. The Santa Maria Basin contained 115 of the 243 tracts to be involved in the sale.[1]

A draft environmental impact statement ("DEIS") was released for public comment in April 1980. The DEIS, which analyzed the environmental impacts in the five basins to be included in Lease Sale No. 53, was based on a resource estimate of 404 million barrels for the Santa Maria Basin.

On July 8, 1980, the California Coastal Commission requested that the Secretary submit a consistency determination at the time of the issuance of the proposed notice of sale.

In September 1980, a final environmental impact statement (the "EIS") was released. Shortly before its publication, on or about August 28, 1980, the United States Geological Survey ("USGS") made available revised resource estimates for the Santa Maria Basin in the amount of 794 million barrels of oil. The revised estimate, which almost doubled the previous estimate, was incorporated in an addendum to the EIS.

Also during the fall of 1980, BLM consulted with the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS") concerning the jeopardy posed to any endangered or threatened species by Lease Sale No. 53. The NMFS rendered a biological opinion that Lease Sale No. 53 would not jeopardize the endangered gray whale. The FWS rendered a biological opinion that the sale would not jeopardize the threatened sea otter.

During this period, a Secretary Issue Document ("SID") was prepared by the Department of Interior. An SID is an internal document intended to aid the Secretary in making decisions concerning lease sales. The Department of Interior released the SID for Lease Sale No. 53 in October 1980.

On October 16, 1980, former Secretary of the Interior Cecil D. Andrus issued the proposed notice of sale for Lease Sale No. 53. The notice proposed leasing only within the Santa Maria Basin. Secretary Andrus deleted the four other basins from the proposed sale.

By letter of October 22, 1980, the Department of Interior notified the CCC of its "negative determination" that the preleasing activities associated with Lease Sale No.

---

1. Although 243 tracts were originally to be considered for proposed Lease Sale No. 53, BLM later established that the total sale area would involve 242 tracts comprising 1.315 million acres.

53 had no "direct effects" on California's coastal zone. In response to the negative determination, on December 16, 1980, the CCC adopted a resolution that the deletion of 31 tracts (29 tracts in the final notice of sale) in the northern portion of the Santa Maria Basin was necessary in order for Lease Sale No. 53 to be consistent with the California Coastal Management Plan ("CCMP"). (As 4 of the tracts were combined as 2 for sale purposes, the CCC resolution is actually directed to 29 tracts.)

On December 24, 1980, the Governor of California, Edmund G. Brown, Jr., responding to Secretary Andrus' proposed notice of sale, recommended the deletion of 34 tracts located in the northern portion of the Santa Maria Basin. (Although the recommendation referred to 34 tracts, 4 of the tracts were combined as 2 tracts for sale purposes; therefore, only 32 tracts were actually encompassed by the Governor's recommendation.) Governor Brown's letter and enclosed recommendations were subsequently transmitted to the new Secretary of the Interior Watt by a memorandum from Deputy Assistant Secretary Heather L. Ross.

On February 10, 1981, Secretary Watt issued a revised proposed notice of sale for Lease Sale No. 53. The four basins previously deleted from the proposed sale were once more included in the sale. The revised notice continued to propose leasing in the Santa Maria Basin. In transmitting the revised proposed notice to Governor Brown, Secretary Watt requested recommendations pursuant to § 19 of OCSLA, 43 U.S.C. § 1345.

By letter dated April 7, 1981, Governor Brown submitted his recommendations concerning the revised Lease Sale No. 53. He reiterated his position that, based upon the balancing test of § 19 of OCSLA, the northern 32 tracts should be deleted from the sale. Enclosed with the letter detailing Governor Brown's recommendations were comments and recommendations from various state agencies and local governments in California.

On April 10, 1981, the Department of Interior issued a news release in which Secretary Watt announced that he planned to divide Lease Sale No. 53 into two sales, with the sale of the tracts in the Santa Maria Basin to be held in May 1981 and the sale of the remaining tracts to be postponed. The Secretary stated that his decision to lease the entire Santa Maria Basin was based on a finding of overriding national interest. The final notice of sale for Lease Sale No. 53, Santa Maria Basin, was published on April 27, 1981.

By letter dated May 1, 1981, Secretary Watt notified Governor Brown of the rejection of California's recommendations concerning the lease sale in the Santa Maria Basin. In the communication sent to Governor Brown, Secretary Watt provided a brief explanation of the basis for his previous rejection of the recommendation.

Between the Call for Nominations on OCS Lease Sale No. 53 in November 1977 and May 1, 1981, the State of California, its agencies and the local governments submitted to the Department of Interior more than 20 separate communications seeking the deletion or delay of the sale of tracts in the Santa Maria Basin. Excluding the call for nominations and the letter of May 1, the Department of Interior submitted at least three separate communications to the state or to the CCC in regard to the disputed tracts within Lease Sale No. 53.

On April 29, 1981, plaintiffs in *California v. Watt* and in the companion case of *NRDC v. Watt* filed this action. On May 27, 1981, the Court granted a preliminary injunction in *California v. Watt*. Subsequently, on July 10, 1981, the consolidated cases came on for hearing on cross motions for summary judgment.

With respect to the CZMA, 29 tracts in the northern portion of the Santa Maria Basin are at issue. (Due to the consolidation of 4 tracts into 2, the 31 tracts, as initially identified by Secretary Andrus in the October 1980 notice of sale, were viewed as 29 tracts at the time of the April 1981 final notice of sale.) The 29 tracts, numbered 129 to 155 and 158 to 161, range seaward from 3 miles to approximately 24 miles and lie in an area in which the water depths range from 50 to 750 meters (162 to

2,437 feet). *See* Administrative Record No. 511w (U.S. Dept. of Interior, BLM Memorandum, June 4, 1981 at 3); Environmental Impact Statement ("EIS"), Vol. 1 at 1–9. Tract numbers 130, 131, 133, 134, 136 to 138, 140 to 151, 153 to 155, 160 and 161 are within 12 miles of the coastline. *See* Defendant's Exhibit L–G at 289–90 (letter, from the State of California's Department of Fish and Game to the Resources Agency of the State of California). Administrative Record No. 511w (U.S. Dept. of Interior, BLM Memorandum, June 4, 1981 at 3); Administrative Record No. 411w (California Coastal Comm. Letter, April 8, 1981 at 2); Administrative Record No. 165w (CCC Comments on the Draft Environmental Impact Statement ("DEIS") on Proposed OCS Lease Sale # 53, June 4, 1980 at 2); Administrative Record No. 158w (U.S. Dept. of Interior, BLM Press Release, May 9, 1980); EIS at 1–10. Of these tracts, numbers 138, 142, 143, 146, 147 and 151 are within 6 miles of the shore, EIS at 2–18; SID at 73; portions of tract numbers 130, 131, 134, 137, 141, 144, 145, 149, 150, 154, 155, 160 and 161 are within 6 nautical miles of the shore, EIS at 2–18, 2–19; Defendant's Exhibit L–G at 292–93, letter from the Department of Parks and Recreation to the U.S. Dept. of Interior, Office of Planning and Research. The remaining tracts, numbers 129, 132, 135, 139, 148, 152, 158 and 159 range seaward from approximately 12.5 to 24 miles. *See* Administrative Record No. 511w (U.S. Dept. of Interior, BLM Memorandum, June 4, 1981 at 3).

With respect to the other statutes, NEPA, OCSLA, ESA and MMPA, three additional tracts are in dispute. They are numbered 162 to 164. They also range seaward from 3 miles to approximately 24 miles and lie in an area in which the water depths range from 50 to 750 meters (162 to 2,437 feet). Administrative Record No. 511 (U.S. Dept. of Interior, BLM Memorandum, June 4, 1981 at 3); EIS, Vol. 1 at 1–9.

## II. THE COASTAL ZONE MANAGEMENT ACT

### A. The Issue Presented

■ Plaintiffs in this case contend that the Final Notice of Lease Sale No. 53 "directly affects" the California coastal zone and, therefore, the Secretary of the Interior must conduct the pre-lease activities relating to Lease Sale No. 53 in a manner which is, "to the maximum extent practicable", consistent with the California Coastal Management Program (CCMP), pursuant to § 307(c)(1) of the CZMA. 16 U.S.C. § 1456(c)(1). Thus, the principal issue in this case with respect to the CZMA is whether the Secretary violated that Act by making a "negative determination" that no consistency review was required for the Final Notice of Lease Sale No. 53. *Id.*; 15 C.F.R. §§ 930.34–.35.

■ The threshold test for the application of § 307(c)(1) is whether the activity in question will have a "direct effect" on the coastal zone. If a federal agency determines that its proposed activity *will not* directly affect the state's coastal zone, it must provide the administrator of the state coastal program with written notice briefly setting forth the reasons for that conclusion. 15 C.F.R. § 930.35(d) (1980). That notice is called a "negative determination". *Id.* On the other hand, if a federal agency determines that the activity in question *will* directly affect the coastal zone, the federal agency must provide the administrator of the state coastal program with a written notice, called a "consistency determination", that the activity will be carried out in a manner which conforms with the state program. 15 C.F.R. § 930.34(a) (1980).

The issue is squarely presented in this case of first impression: does the Final Notice of Lease Sale with respect to the 29 tracts in the northern portion of the Santa Maria Basin directly affect the coastal zone of the State of California? The resolution of this issue turns on an interpretation of the phrase "directly affect" as it is used in the CZMA.

■ Established rules of statutory construction require that the Court turn first to the "language in which the act is framed, and if that is plain, . . . to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). If the meaning of the statutory text is clear and unambiguous,

the Court's task is minimal. That is not the case here as the language of § 307(c)(1) is neither clear nor unambiguous.[2] The Act itself provides no definition of the key terms employed in the section. Thus, in order to construe and interpret § 307(c)(1), the Court is required to turn to the Act's stated purposes, the legislative history, and the interpretations of agencies charged with administering the Act.

### B. The Statutory Purpose

 Effectuating the purpose of a statute should be a primary concern of a court in construing the meaning of disputed language within it. *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975), quoting *United States v. Heirs of Boisdoré*, 8 How. 113, 122, 12 L.Ed. 1009 (1849). Further, a court should not ignore policy considerations in favor of mechanical interpretation in seeking the proper construction of a statute. *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1280 (9th Cir. 1980), citing to *United States v. Anderson*, 76 U.S. 56, 65–66, 19 L.Ed. 615 (1869). Thus, the question of which activities fall within the scope of 307(c)(1) must be considered in light of the statutory purpose of the CZMA.

 The CZMA was enacted in order to provide comprehensive, coordinated planning for the protection and beneficial use of the resources of the coastal zone. 16 U.S.C. §§ 1451, 1452. Special emphasis was placed on the objective of preserving the natural resources within this area "for this and succeeding generations". 16 U.S.C. § 1452(1). In enacting the CZMA, Congress intended to establish an effective scheme for the long-term management of the valuable resources found within the coastal zone of the United States.

The "key" to the management scheme envisioned by Congress is "to encourage the states to exercise their full authority over the lands and waters in the coastal zone". 16 U.S.C. § 1451(i). This authority granted to the states is to be exercised "in cooperation with Federal and local governments and other vitally affected interests". *Id.* Thus, the primary authority in the management scheme is to be bestowed upon those coastal states which develop and implement comprehensive management programs for their respective coastal areas.

While the Act assigns final responsibility for management to states with such a program, the federal agencies are given significant power over the policy choices which a state incorporates into its coastal management plan. Under the Act, the Secretary of Commerce may not give the required approval to the state's proposed plan "unless the views of Federal agencies principally affected by such program have been adequately considered". 16 U.S.C. § 1456(b). Another prerequisite for the approval of the Secretary of Commerce is a finding that the state's program "provides for adequate consideration of the national interest". 16 U.S.C. § 1455(c)(8).

To induce the states to develop and implement comprehensive management programs in accord with the views of federal agencies, Congress provided that federal activities are to be consistent with the approved state management program.[3] To this end, Congress designated five categories of federal actions which are subject to the requirement of a consistency review.

 The consistency provisions under the CZMA, each subjecting particular categories of federal actions to review, are: (1) federal activities, conducted or supported by a federal agency, which directly affect the coastal zone; (2) federal development projects in the coastal zone; (3) activities of applicants for federal licenses or permits

---

**2.** During the 1980 Oversight Hearings held before the House Subcommittee on Oceanography, Chairman Gerry E. Studds remarked, "I think particularly that sections 307 and 308 challenge anyone whose native tongue is English to discern what Congress had in mind when it wrote those sections." Proposed Amendments to the CZMA: Hearings on H.R. 6956 and H.R. 6979 before the Subcommittee on Oceanography of the House Committee on Merchant Marine & Fisheries, 96th Cong., 1st and 2d Sess. 88 (1980).

**3.** Linsley, Federal Consistency and Outer Continental Shelf Oil and Gas Leasing, 9 Boston C. Envt'l. Affairs L.Rev. 429, 433 (1981).

where the proposed activities will affect land and water uses in the coastal zone; (4) OCS post-lease sale activities which require a federal license or permit and will affect any land use or water use in the coastal zone; and (5) federal programs which provide funding to state and local governments for projects which will affect the coastal zone §§ 307(c)–(d), 16 U.S.C. §§ 1456(c)–1456(d). Administrative procedures have been established to facilitate the implementation of the consistency requirements under the Act.[4]

Obviously, one incentive for state participation in a federal coastal management program is the federal funding for the program. 16 U.S.C. §§ 1454, 1455. The grants, however, are of limited duration. Thus, in reality, the requirement of consistency review is the principal permanent inducement to the state's development of a coastal management plan. There is therefore a *quid pro quo* in the legislative scheme:[5] the state agencies are to participate actively in designing the state management program, and, in return, the federal agencies *"shall* conduct" their activities "in a manner which is, to the maximum extent possible, consistent" with the state's program. 16 U.S.C. § 1456(c) (emphasis added).

The management program created under the CZMA is intended to be comprehensive. Congress intended that federal-state consultation procedures extend to all phases of the management of coastal resources. To be considered during consultation are such issues as the orderly siting of energy facilities, including pipelines, oil and gas platforms, and crew and supply bases, and the minimization of geological hazards. 16 U.S.C. §§ 1452(2)(B)–(C), 1453(6). Directing the coastal states to identify potential problems with respect to marine and coastal areas and to prevent unavoidable losses of any valuable environmental or recreational resource as a result of "ocean energy activities", Congress intended that the states be involved at the initial stages of decision-making related to the coastal zone. 16 U.S.C. §§ 1456a(c)(3); 1456b(a). The Act requires that the coastal state's management program include a "planning process for energy facilities likely to be located in, or which may significantly affect, the coastal zone, including, but not limited to, a process for *anticipating and managing* impacts from such facilities". § 1454(b)(8) (emphasis added). In order to anticipate impacts and prevent unnecessary losses in the coastal zone, it is manifest that the consultation process was intended to begin at the earliest possible time.

Any interpretation of the phrase "directly affect" must give due consideration to the reciprocal roles intended to be assigned to federal agencies and to the states. The states are intended to have a significant role in essential planning and coordination for the development of the coastal zone. They are intended to be involved in every stage of the planning from drawing board to execution.

Special grants are offered to induce the states to create federally-approved comprehensive management plans which provide for inter-governmental cooperation. California designed and created such a plan.[6]

---

**4.** The federal agency makes an initial determination whether its activity "directly affects" the coastal zone. 15 C.F.R. § 930.33(a) (1980). The federal agency must evaluate its activity in light of the provisions of the state's coastal management program. 42 Fed.Reg. 43,590 (1977). If the federal agency determines that the activity will directly affect the coastal zone, it must provide the state with a "consistency determination", which indicates whether the proposed activity will be undertaken in a manner which conforms with the state program. 15 C.F.R. §§ 930.34(a), 930.39. If the federal agency determines instead that the activity has no direct effects upon the coastal zone, it must provide the state with a "negative determina-

tion". *Id.* § 930.35(d). Mediation is available in the event that the federal agency and the state disagree as to the propriety of a negative determination or the validity of a consistency determination. *Id.* §§ 930.110–115. *See Linsley, supra,* at 438–440.

**5.** Schoenbaum & Parker, Federalism in the Coastal Zone, 57 N.C.L.Rev. 231, 239 (1979).

**6.** The California Coastal Management Program ("CCMP") is the program adopted by California pursuant to the CZMA. *See American Petroleum Institute v. Knecht,* 456 F.Supp. 889 (C.D.Cal.1978).

It would be anomalous to impute to the Congress which induced the states to formulate these plans an intention to permit the federal government to proceed with critical decision-making in total disregard of them. Congress can hardly have had such an intent. The CZMA was purposely designed to encourage cooperation between federal, state and local governments rather than conflict, and it should be construed in a manner which will effectuate that purpose.

Pre-leasing activities, including the call for nominations, the publication and circulation of an environmental impact statement, and the publication of a final notice of lease sale, define and establish the basic parameters for subsequent development and production. During the pre-leasing stage, which culminates in the final notice of lease sale, critical decisions are made as to the size and location of the tracts, the timing of the sale and the stipulations to which the leases are subject.[7] Each of these are key Outer Continental Shelf (hereinafter referred to as the OCS) planning decisions. The selection of tracts to be let determines where the lessee can explore and produce oil and gas. The decision to offer or delete various tracts also determines which estuaries, reefs, wetlands, beaches, or barrier islands are exposed to the risk of oil spills and which are not. The particular stipulations imposed on the lessors, along with the designated location of the tracts, influence the flow of vessel traffic, the placement of platforms and drilling structures, as well as the siting of on-shore construction. Stipulations included in the lease determine what equipment is to be used and what training is to be provided by lessees to those working on the tracts. In addition, decisions made during the pre-leasing stage establish the timing of OCS development and production.[8] Thus, the leasing sets in motion the entire chain of events which culminates in oil and gas development.

The purpose of the act would not be furthered by excluding the states from the critical decision-making relating to oil and gas resources in the OCS. If the state is consulted only after the plans are drawn and the parameters for exploration and development are set, as a practical matter, it will be relegated to the defensive role of objecting to the proposals of individual lessees as they are presented. Thus, the comprehensive planning in accordance with the management plan cannot occur and there will be no opportunity for the orderly decision-making envisioned by the draftsmen of the CZMA.

### C. The Legislative History of the CZMA

The legislative history, while somewhat inconclusive, sheds some light on the Congressional intent in enacting this provision. As the Act was first passed in 1972, amended in 1976 and in 1980, Congress has had ample opportunity to debate the legislation. The text of § 307(c)(1) in the original bill, as passed by both House and Senate, provided that all federal activities "in the coastal zone" were subject to § 307(c)(1). Without explanation, the Conference Committee altered the language and substituted the phrase "directly affecting the coastal zone" for "in the coastal zone". On balance, this substitution seems to have been intended to expand the scope of the provision. Activities occurring outside of the coastal zone, such as OCS activities, as well as activities within the coastal zone, were made subject to consistency review. A caveat, however, was appended to the revision. In order to be subject to consistency review, the effect must be "direct". The 1972 legislative history is silent as to the import of this change.

In 1976 Congress amended the CZMA. Coastal Zone Management Act Amendments of 1976, Pub.L.No.94–370, 90 Stat. 1013 (1976) (amending 16 U.S.C. §§ 1451–1464). Section 307(c)(1) was not amended,

---

7. Absent special circumstances, no tract leased on the OCS is to exceed 5,760 acres. 43 U.S.C. § 1337(b)(1). The lessee is entitled to explore, develop and produce the oil and gas found within the area of that tract.

8. The original lease is valid for a period of 5 to 10 years. 43 U.S.C. § 1337(b)(2).

and the legislative history of the 1976 amendments does not address this particular provision. However, there are references within the legislative history to the question of the applicability of consistency requirements to the decision to lease. Certain statements relate to the purpose of the Act as a whole. The Senate Report expressed concern that "[t]here is very little coordination or communication between Federal agencies and the affected coastal states prior to major energy resource development decisions, such as the decision to lease large tracts of the OCS for oil and gas .... Full implementation of the Coastal Zone Management Act of 1972 ... could go far to institute the broad objectives of Federal-State cooperative planning envisioned by the framers of the act". S.Rep.No.94–277, 94th Cong., 2d Sess. 3, *reprinted in* [1976] U.S.Code Cong. & Ad.News 1770.

During its consideration of the 1976 Amendments, Congress did address a different subsection within the same section of the 1972 Act—307(c)(3), now § 307(c)(3)(A). That subsection requires that applicants for a federal permit or license for an activity affecting the coastal zone include in the application a certification of consistency of the proposed activity with the state's coastal management program. Both the House and the Senate concluded that Congress had intended that the "consistency clause" (i. e., § 307(c)(3)) in the 1972 act apply to Federal leases for offshore oil and gas. S.Rep.No. 94–277, *supra*, 19–20, 36–37, 53–54, 59; H.R. Rep.No.94–878, 94th Cong., 2d Sess. 4, 52–53, 67–68. Nevertheless, by amendment on the floor of the House, the explicit requirement of consistency certification for offshore leasing was deleted from § 307(c)(3). 122 Cong.Rec. 6128. The final version of § 307(c)(3) imposed no consistency certification requirement on the lessee.

■ Defendants infer from the Congressional decision to exclude leasing from the consistency certification process under § 307(c)(3) an intention to exclude pre-leasing activities from all consistency review. They assert that § 307(c)(3) supersedes

§ 307(c)(1). Thus, defendants read the Congressional silence as to the continuing validity of § 307(c)(1) as a repeal by implication.

■ The Supreme Court has consistently applied the "cardinal rule ... that repeals by implication are not favored". *Morton v. Mancari,* 417 U.S. 535, 549–551, 94 S.Ct. 2474, 2482–2483, 41 L.Ed.2d 290 (1974); *Wood v. United States,* 16 Pet. 342–343, 363, 10 L.Ed. 987 (1842). In the absence of an affirmative showing of an intention to repeal, effect must be given to each section of the statute. *Id.* Where there is no "positive repugnancy" between the two provisions, the subsequently enacted provision does not repeal the previously enacted provision. *United States v. Borden Co.,* 308 U.S. 188, 198–99, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939).

There is no "repugnancy" between § 307(c)(1) and 307(c)(3). The former subsection imposes obligations on the federal government which in the present context is the lessor, whereas the latter subsection imposes obligations on private sector applicants for a federal license or permit, which in the present context are the lessees. Certainly the legislative history for the 1976 Amendments does not imply any intention to make § 307(c)(3) the exclusive mode of invoking consistency review. Under § 307(c)(3), consistency requirements are imposed on the specific activities relating to permits and licenses, whereas under § 307(c)(1), consistency requirements are imposed on a residual category of federal actions which are neither development projects nor related to permits and licenses. 15 C.F.R. § 930.31 (1980); *see* 44 Fed.Reg. 37,146 (1979) (NOAA's comment to 15 C.F.R. § 930.31 (1979)).

In 1980, Congress reauthorized the CZMA. Coastal Zone Management Improvement Act of 1980, Pub.L.96–464, 94 Stat. 2060 (1980). Congress amended certain sections of the Act, but did not alter any of the section 307 consistency provisions. Both the House and Senate Committees acknowledged the existence of a disagreement over the applicability of the consistency provisions to the final notice of OCS lease sale.[9] In order to clarify the

---

9. "The committee is cognizant of one disagreement between California and the Department

of Interior which led to a resolution effort through formal mediation proceedings conduct-

intent of these provisions, the House Committee explained in its report accompanying the 1980 amendments that the 1976 amendments to § 307 "did not alter Federal agency responsibility to provide States with a consistency determination related to OCS decisions which preceded issuance of leases".[10] H.R.Rep.No.96–1012, 96th Cong., 2d Sess. 28, *reprinted in* [1980] U.S.Code Cong. & Ad.News 4376. The Senate Committee specifically discussed the relationship between section 307(c)(1) and OCS pre-lease activities:

> The Department of the Interior's activities which preceded lease sales were to remain subject to the requirements of section 307(c)(1). As a result, intergovernmental coordination for purposes of OCS development commences at the earliest practicable time in the opinion of the Committee, as the Department of the Interior sets in motion a series of events which have consequences in the coastal zone.

S.Rep.No.783, 96th Cong.2d Sess. 11 (1980).

The 1980 Congress also recognized the uncertainty that had arisen concerning the interpretation of the threshold test of "directly affecting" the coastal zone. H.R. Rep.No.96–1012, 96th Cong., 2d Sess. 34–35, *reprinted in* [1980] U.S.Code Cong. & Ad. News 4382–83. Referring to earlier congressional deliberations, the House Committee presented two alternative definitions of the phrase "directly affecting". The threshold test applies "whenever a Federal activity ha[s] a functional interrelationship from an economic, geographic or social standpoint with a State coastal program's land or water use policies". *Id.* at 34, U.S. Code Cong. & Admin.News at 4382. As an alternative phrasing of the threshold test, the House Committee stated that the Federal consistency requirements should apply

"when a Federal agency initiates a series of events of coastal management consequence". *Id.* Congress indicated its support of an "expansive interpretation of the threshold test". *Id.* at 35, U.S.Code Cong. & Admin.News at 4383. In order to effectuate the purposes of the Act, consultation between federal and state agencies should occur "at the earliest practicable time". *Id.* at 34, U.S.Code Cong. & Admin.News at 4382; *see also* S.Rep.No.783, *supra.*

Defendants contend that the 1980 legislative history is not entitled to great weight. They argue that, in interpreting the intent of the body which enacted the statute, no deference is due to statements of a "post-enactment Congress". In support of this view, defendants cite a frequently quoted dictum: "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one". *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960).

The present situation is readily distinguishable from that in *United States v. Price*. There the inferences of legislative intent did not flow from explicit Congressional statements, but from Congressional inaction on amendatory legislation. The sole passing reference by Congress to the disputed provision was characterized by the court in *United States v. Price* as "a slender reed". *Id.* at 313, 80 S.Ct. at 332. In contrast, the recent legislative history of the CZMA contains statements of great significance from both houses of Congress.

■ While subsequent legislative history generally is not controlling, neither should subsequent congressional interpretation be "rejected out of hand". *Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n.8, 100 S.Ct. 1932, 1938, 64 L.Ed.2d 593 (1980). While

ed by the Department of Commerce". H.Rep. R.No.96–1012, 96th Cong., 2d Sess. 34, *reprinted in* [1980] U.S.Code Cong. & Ad.News 4382. *See also* S.Rep.No.96–783, 96th Cong., 2d Sess. 11.

**10.** There was no conference report on the Coastal Zone Management Improvement Act of 1980. After the language of the Senate bill was

amended to contain the text of the House bill, the Senate bill was passed in lieu of the House bill. [1980] U.S.Code Cong. & Ad.News 4362. Under these circumstances, the House Report should be accorded greater weight than might be appropriate if there were a more authoritative source from which to glean the intent of the legislature as a whole. *See* D. Sands, 2A Sutherland Statutory Construction § 48 (1973).

acknowledging that the admonition propounded in *United States v. Price* remains sound, the Supreme Court explained in *Andrus* that a court should nevertheless give appropriate weight to arguments predicated upon congressional actions. *Id.* The court should not overlook valuable sources in the search for legislative intent. *See Walt Disney Productions v. United States*, 480 F.2d 66, 68 (9th Cir. 1973), *cert. denied*, 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

■ Here, the 1980 legislative history has special relevance. In reauthorizing the 1972 Act, Congress made explicit references to the provision in dispute, as well as to the very phrase within the disputed provision. This Court is bound to give careful consideration to the explicit statements made by the 1980 Congress during its reauthorization of the CZMA.

■ Only a definition which provides for the application of § 307(c)(1) at the decision-making stage of the leasing process will effectuate the congressional intent and give proper meaning and focus to the Act. Clearly, the consistency requirement should apply when a federal agency initiates a series of events which have consequences in the coastal zone. Any other interpretation would thwart the purposes of the Act.

### D. Interpretation by Reference to Related Statutes

The defendants argue that the Secretary's obligations under § 307(c)(1) must be interpreted in light of his obligations under OCSLA, as well as under NEPA and ESA. An expansive interpretation of the Secretary's duties under § 307, according to defendants, would create a conflict with the functions and purposes of the other applicable statutes affecting the OCS.

As to the relationship between OCSLA and the CZMA, defendants contend that to impose the requirement of consistency review on pre-leasing activities would nullify § 19 of OCSLA which provides for the Secretary's consideration of recommendations submitted by a state governor. 43 U.S.C. § 1345. Defendants explain that the scheme of regulation of the OCS as set forth in the 1978 Amendments of OCSLA, Pub.L.No.95–372, 92 Stat. 629 (1978), accords the Secretary the authority to direct development of the OCS. In defendants' view, the construction of the CZMA urged by plaintiffs would result in a substitution of the state's judgment for the Secretary's, contrary to the intent of Congress as expressed in the amendments to OCSLA. Therefore, defendants urge the Court to give "overriding weight" to § 19 of OCSLA in construing § 307 of the CZMA.

■ At the outset, it should be noted that the CZMA has certain unique objectives which set it apart from the other statutes relied upon by defendants. NEPA, OCSLA, ESA, and the CZMA share the common goal of preserving and protecting the nation's resources.[11] Only the CZMA was intended to encourage active participation of state and local governments in developing and implementing the plans for meeting the common goal.[12] In the remaining statutes, Congress imposes certain responsibilities on the federal government and federal agencies without mandating

---

**11.** The CZMA was enacted by Congress "to preserve, protect, develop, and, where possible, to restore or enhance, the resources of the Nation's coastal zone." 16 U.S.C. § 1452(a).

OCSLA directs the Secretary of the Interior to prescribe rules and regulations deemed "necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein." 43 U.S.C. § 1334(a)(1).

NEPA recognizes that "each person has a responsibility to contribute to the preservation and enhancement of the environment". 42 U.S.C. § 4331(c). *See also* 42 U.S.C. § 4331(b).

Principal purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species". 16 U.S.C. § 1531(b).

**12.** *See* 16 U.S.C. § 1452. As one commentator observed, the CZMA "reflects a strong congressional intent to give states and their delegates a more significant management role than the national government". Finnell, Federal Regulatory Role in Coastal Land Management, 1978 American Bar Foundation Research Journal 173, 249–250.

participation by the states into the statutory scheme.

Although both the CZMA and OCSLA focus on offshore oil and gas leases, there is a marked difference in the central focus of each statute. *Massachusetts v. Andrus*, 594 F.2d 872 (1st Cir. 1979). Under OCSLA, the emphasis is upon development of oil, gas and other minerals. In contrast, the CZMA is a statute directed to, and solicitous of, environmental concerns. *American Petroleum Institute v. Knecht*, 456 F.Supp. 889, 919 (C.D.Cal.1978), *aff'd*, 609 F.2d 1306 (9th Cir. 1979). Due to this significant difference in objectives between CZMA and the other statutes, it is doubtful that it would be proper to interpret the CZMA in light of the other statutes.

Obviously, the court must construe federal statutes so that they are consistent with each other, as by this means congressional intent can be given its fullest expression. *Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726, 729 (9th Cir. 1978). If particular statutory provisions can be construed to be in harmony with each other, it is unnecessary to accord "overriding weight" to a single provision. Therefore, the court must examine to what extent § 19 of OCSLA imposes duties which conflict with the consistency requirements under § 307(c)(1) of the CZMA. Where sections of the statutes, such as § 19 of OCSLA and § 307 of the CZMA seem to overlap, it is the role of the court to give each statutory section effect as long as they are capable of co-existence. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976), quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Here, both § 19 of OCSLA and § 307 of the CZMA can be given effect without frustrating the purpose of either statute.

An examination of the language of the "savings clause" in OCSLA resolves the misconception that § 19 of OCSLA was intended to repeal the consistency requirements under § 307 of the CZMA. Section 608 of the 1978 Amendments to OCSLA expressly provides: "[N]othing in this Act shall be construed to modify, or repeal any provision in the Coastal Zone Management Act of 1972". 43 U.S.C. § 1866. In its discussion of § 19 of OCSLA, the House Committee attempted to clarify the potentially overlapping roles of the federal agency and the state in light of the CZMA's consistency requirements. Referring to the savings clause, 43 U.S.C. § 1866, the House Report explains: "Specifically, nothing is intended to alter procedures under [the Coastal Zone Management] Act for consistency once a State has an approved Coastal Zone Management Plan". H.R.Rep.95–590, 95th Cong., 2d Sess. 153, n.52, *reprinted in* [1978] U.S.Code Cong. & Ad.News 1559.

An analysis of the rights and duties imposed by the two statutes reveals the mode of "co-existence" of the CZMA and OCSLA. Although both provisions focus on the leasing process, neither the obligations imposed nor the parties involved in the two provisions are identical. Section 19 of OCSLA requires that the Secretary consider recommendations submitted by the governor of the state where the lease sale is to be held. 43 U.S.C. § 1345. Once the Secretary has made certain determinations with regard to the recommendation, his decision to accept or reject the recommendations is final. In contrast, § 307(c) of the CZMA does not require that the Secretary evaluate such recommendations. The frame of reference for the Secretary's determination under the CZMA is the state's coastal management plan. The CZMA does not deprive the Secretary of the opportunity to regulate size, timing or location of proposed lease sales. No absolute veto power has been bestowed upon plaintiffs by § 307(c)(1). Instead, the CZMA provides a more complete opportunity for federal-state consultation and cooperation. In the event serious disagreements arise between the state and the federal government as to the propriety of the federal agency's determination, either party may seek mediation. 16 U.S.C. § 1456(h); 15 C.F.R. § 930.113–116.

In claiming that § 19 of OCSLA denies the states the right to participate in consultation or coordination of pre-leasing activities, defendants rely on *California v. Kleppe*, 604 F.2d 1187 (9th Cir. 1979). In

*California v. Kleppe*, the Ninth Circuit focused on the question whether Congress intended the Secretary of the Interior or the Environmental Protection Agency to promulgate air quality regulations for the Outer Continental Shelf. The Secretary claimed authority to promulgate the regulations pursuant to OCSLA, while the EPA claimed authority to do so under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* Looking to the legislative history and the language of the 1978 Amendments to OCSLA, the court found no indication that Congress had contemplated "dual jurisdiction" of the Secretary and of EPA over OCS activities which affect air quality. *California v. Kleppe, supra* at 1194. According to the court's analysis, there is no suggestion that the Secretary is to share authority to promulgate air quality regulations for the OCS. *Id.* at 1193.

The present case is readily distinguishable from *California v. Kleppe.* In contrast, here Congress did contemplate concurrent authority of the state and the federal agencies over the coordination of OCS activities. Although the savings clause, § 608 of OCSLA, 43 U.S.C. § 1866, does not explicitly protect whatever authority EPA might have had pursuant to its jurisdictional grant under the Clean Air Act, 42 U.S.C. § 7607(b)(1), it does explicitly provide that the requirements under the CZMA are neither modified nor repealed by the 1978 Amendments to OCSLA. The duties imposed on the Secretary under OCSLA are compatible with the duties imposed under the CZMA. Enforcement of the requirements of § 307 of the CZMA will not frustrate the Secretary's authority under OCSLA to make the resources of the OCS "available for expeditious and orderly development, subject to environmental safeguards". *See* 43 U.S.C. § 1332(3). Participation in the consultation process envisioned by the CZMA will, in fact, further the purposes of the CZMA.

 Even though the obligations imposed on the Secretary under the CZMA do not impair his authority under OCSLA, it is conceded that the Secretary may be confronted by the complex task of resolving competing interests and balancing the numerous priorities set by Congress. Also, some delays are inherent in a planning process involving participants at all levels of government. But, it is not the proper function of the judiciary to question the means Congress has chosen to manage the resources of the coastal zone. This is a matter committed to legislative judgment. *Cf. Hodel v. Virginia Mining and Reclamation Assoc.*, —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

**E. NOAA's Interpretation**

 The administrative agency's interpretation of a statutory provision also aids the Court in its determination of the legislative intent of the CZMA. It is a settled principle that an agency's interpretation of a statute is normally entitled to deference from the courts. *Train v. NRDC*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *see also American Petroleum Institute v. Knecht*, 456 F.Supp. 889 (C.D.Cal.1978). Here, the National Oceanic and Atmospheric Administration ("NOAA") is the agency within the Department of Commerce charged with the responsibility of promulgating regulations for the CZMA. *See American Petroleum Institute v. Knecht, supra*, at 908. During enactment of the 1976 amendments, Congress specifically directed NOAA to clarify certain requirements of the Act and thus affirmed the responsibility NOAA had assumed in administering the 1972 Act. The fact of NOAA's technical expertise in matters relating to the nation's coasts also suggests that deference should be accorded to its continuing construction of this Act. *See Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App.D.C. 373, 541 F.2d 1 (1976).

Until May 1981, NOAA consistently took the position that Interior's pre-leasing activities were subject to consistency review. For instance, in 1977, NOAA responded to a request to clarify the statutory language in the consistency provisions of § 307. NOAA then stated that it was "considering a posi-

tion which treats the Department of the Interior's pre-lease sale decisions, such as tract selections and choice of lease stipulations, as a 'Federal activity' subject to the requirements of § 307(c)(1) of the Act". 42 Fed.Reg. 43586, 43591 (1977) (comment accompanying second set of proposed regulations). In light of the dispute between Interior and Commerce as to the applicability of the § 307(c)(1) consistency requirements to the OCS leasing process, NOAA refrained from taking a firm position at that time. *See* 42 Fed.Reg. 43592; 43 Fed.Reg. 10510, 10512 (1978).

NOAA's final regulations in 1978 were based upon a liberal construction of all threshold tests triggering consistency review under § 307. NOAA concluded that § 307(c)(1) (as well as the following subsections) was intended to apply to "all Federal actions which were *capable* of significantly affecting the coastal zone".[13] 43 Fed.Reg. 10510, 10511 (1978) (emphasis added). Favoring broad inclusion of federal activities in the process of consistency review, NOAA concluded that a federal action would meet the threshold test under § 307 even when cumulative effects are determined to be beneficial.[14] 43 Fed.Reg. 10510, 10519 (1978) (to be codified at 15 C.F.R. §§ 930.-10–.145).

The NOAA regulations, as amended in June 1979, reflect the view that pre-leasing activities fall within the purview of § 307(c)(1). 44 Fed.Reg. 37142–43, 37146–47 (1979) (comment to 15 C.F.R. § 930.33 (1979)). In support of its view, NOAA explained that "[i]mplementation of this requirement at the OCS pre-lease sale stage should lead to minimization of adverse coastal environmental and socioeconomic impacts". 44 Fed.Reg. 37142. According to NOAA's comment, "Federal agencies are encouraged to construe liberally the 'directly affecting' test in borderline cases to fa-

vor inclusion of Federal activities subject to consistency review". *Id.* at 37146–47.

As recently as April 1980, NOAA reiterated this view. In a letter dated April 9, 1980, addressed to State Coastal Management Program Directors, the Assistant Administrator of NOAA stated its view that "Federal consistency requirements subject final notices of OCS sales to consistency determinations". Ex. L–16.

In sum, NOAA's regulations and the comments thereto consistently supported the application of § 307(c)(1) to final notices of OCS sales. The view of the agency charged with implementing the CZMA, established over a long period of time, is certainly entitled to deference.

Recently, however, NOAA's position has changed abruptly. On May 14, 1981, approximately two weeks after the complaints were filed in the present cases, NOAA published a notice of proposed rulemaking in which it defined "directly affecting". 46 Fed.Reg. 26658, 26659 (1981). The definitions adopted by NOAA represent a complete departure from previous interpretations of the threshold phrase. According to NOAA's newly proposed definition, a federal activity directly affects the coastal zone only "if the Federal agency finds that the conduct of the activity itself produces a measurable physical alteration in the coastal zone or that the activity initiates a chain of events reasonably certain to result in such alteration, without further required agency approval". *Id.* In the comments to this notice, NOAA listed lease issuance as an example of an activity which would not be subject to a consistency determination because it does not directly affect the coastal zone. *Id.* at 26660. On July 2, 1981, NOAA issued its notice of final rulemaking which reiterated the view of the consistency

---

**13.** As discussed *infra* at p. 1380, the Court, in accord with the opinion letter issued by the Department of Justice, rejects the specific definition promulgated by NOAA in the 1978 regulations, in which a "significantly affecting" test is substituted for the "directly affecting" threshold test of § 307(c)(1). The rejection of NOAA's definition is not intended to imply a rejection of the general position of the agency

to whom the Department of Commerce has delegated its functions pursuant to the CZMA. Deference to NOAA's support of a liberal construction of the threshold test does not require the adoption of NOAA's exact language in defining a statutory phrase.

**14.** *See* Schoenbaum & Parker, *supra* note 4, at 231.

requirements under the CZMA, as first announced less than two months earlier.

 The new notice of rulemaking is not entitled to special deference here. The Secretary's negative determination was made more than a year before these regulations were issued. Federal defendants admit that these regulations have "no direct bearing on the validity of the Secretary's interpretation". Federal Defendants' Summary Judgment Memorandum at 32, n. 4. There is the ever-present danger that regulations proposed subsequent to the initiation of the litigation are self-serving; thus, they are generally suspect. As newly proposed regulations at variance with the previous regulations, they do not reflect a well-established agency interpretation. Therefore, a principal rationale supporting deference to the agency is absent. *See Ethyl Corp. v. EPA, supra; cf. FTC v. Dean Foods Co.*, 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). Also, the Court finds that this newest interpretation is inconsistent with the CZMA's policy of furthering long-range planning for coastal resources. The Court is "not obliged to stand aside and rubber-stamp an administrative position deemed inconsistent with a statutory mandate". *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Here the position is inconsistent not only with statutory policy, but with the agency's own interpretation during the past four years. Therefore, the Court concludes that although NOAA's longstanding interpretation of the consistency requirements is entitled to deference, NOAA's new interpretation, first proposed in May 1981, is not.

### F. Applicability of Dictionary Definitions

Defendants contend that the phrase directly affects should be construed by reference to the definition of "directly" found in Webster's dictionary. Webster's New International Dictionary (unabridged 3d ed. 1971) provides six alternative definitions for the word "directly":

1. a. without any intervening space or time; next in order; squarely, exactly;
 b. in a straight line; without deviation of course, by the shortest way.
2. a. straight on; along a definite course of action without deflection or slackening;
 b. purposefully or decidedly and straight to the mark; in a straightforward manner without hesitation, circumlocution, or equivocation; plainly and not by implication; in unmistakable terms; unqualifiedly;
 c. without divergence from the source or the original;
 d. simultaneously and exactly or equally.
3. in close relational proximity.
4. a. without any intervening agency or instrumentality of determining influence; without any intermediate step;
 b. in the exact words of the original; verbatim.
5. a. in independent action without any sharing of authority or responsibility;
 b. face-to-face, in person.
6. a. without a moment's delay; at once, immediately;
 b. after a little, in a little while, shortly, presently.

According to defendants, the "plain meaning", based upon the dictionary definition, is "effects resulting from an activity without an intervening cause". Federal Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment at 14. Defendants' invocation of the plain meaning rule to support their choice among rival definitions of an inherently vague phrase should not be allowed to cloud the issue. As one commentator has warned, reliance on the plain meaning rule is too often merely "verbal table thumping to reinforce confidence in an interpretation arrived at on other grounds". Sands, 2A Sutherland Statutory Construction, § 46.01 at 49 (3d ed. 1973).[15] Use of the plain meaning label is simply a subterfuge in the present case. Although Webster offers six alternative definitions, defendants ignore

---

**15.** *See also* Merz, The Meaninglessness of the Plain Meaning Rule, 4 Dayton L.Rev. 31 (1979).

four of the six meanings without explanation. Moreover, their choice of phrasing—"effects resulting from an intervening cause"—is not identical to any definition presented by Webster; it merely incorporates a portion of two of the six alternatives.

■ The defendants' construction of the phrase would produce an unreasonable result. The doctrines of intervening cause and proximate cause are familiar guiding principles in the law of torts, but there is no basis for importing those concepts into the present context. The doctrine of intervening cause was created by the courts to limit the extent of the defendant's liability for damages in tort. W. Prosser, Law of Torts § 44 (4th ed. 1971). It has no relevance in construing the CZMA which has the purpose of providing long-term planning for the presentation and management of coastal resources. Where the "plain meaning" would produce a result at odds with the policy of the statute in question, the Court should look to the purpose of the legislation rather than to a definition borrowed from another context. *Trustees of Indiana University v. United States*, 618 F.2d 736 (Ct. Cl.1980). The dictionary definitions advanced by the defendants are clearly contrary to the congressional intent and, if applied, would thwart the objectives of the CZMA. In fact, as they must admit, if the definitions urged by the Secretary and the intervenor defendants were adopted, the issuance of the final notice of lease sale would require a consistency determination only in the rarest case. Such a result would not be in furtherance of the stated policies and goals of the CZMA.

Finally, although not necessary to this decision, it should be noted that if defendants' definition were applied in construing the threshold test under § 307(c)(1), the

Court need not reach a contrary result. There are cases supporting the view that a lessor may be held liable for activities carried on by the lessee where land was leased for the purpose of carrying on the very activity which caused the harm. *See, e. g., Green v. Asher Coal Mining Co.*, 377 S.W.2d 68 (Ky.1964); *United States v. Morrell*, 331 F.2d 498 (10th Cir. 1964); *Daigle v. Continental Oil Co.*, 277 F.Supp. 875 (W.D. La.1967); *Benton v. Kernan*, 130 N.J.Eq. 193, 21 A.2d 755 (1941). In *Green v. Asher Coal Mining Co., supra*, the court held that the owner of land leased for strip mining purposes could be held liable for injury arising out of the acts of the lessee. The court reasoned that an owner cannot escape liability by showing that he did not personally create the condition or commit the wrongful act, if the expected operations under the lease result in an injury that might have been reasonably anticipated. *Id.* at 72. Similarly, in *Daigle v. Continental Oil Co., supra*, a lessor of land on which the carbon black plant of lessee was located was held liable to adjacent property owners for damage caused by emission of carbon black and coke dust from the plant.

■ In these cases, the parties did not frame their arguments in terms of intervening cause. The results, however, comport with a finding of no intervening cause.[16] The cases stand for the proposition that the lessor is not automatically relieved of liability for activities conducted by his lessee; that is, the lessee's involvement in the tortious conduct does not necessarily constitute intervening cause. Therefore, pre-leasing activities could have direct effects even if "direct" is defined on the basis of tort concepts. Defendants cannot deny that leasing activities have consequences in the coastal zone by pointing to a series of

---

**16.** As defined in Black's Law Dictionary (5th ed. 1979),

> The "intervening cause," which will relieve of liability for an injury, is an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and *which could not have*

*been reasonably anticipated.* (Emphasis added).

Thus, when the court in *Green v. Asher Coal Mining Co.*, 377 S.W.2d 68 (Ky.1964), employed the phrase "reasonably anticipated" in describing the causal connection between the leasing and the injury for which the lessor could be held liable, the court in effect concluded that none of the events subsequent to the leasing constituted intervening cause. *Id.* at 72.

events which occur after the leases are issued, but before the actual effects are realized. The lessor of vast tracts in the OCS where sizeable oil reserves have been estimated to exist "reasonably anticipates" effects in the coastal zone as a result of oil exploration, development, and production to be conducted by the lessees. The reasonable anticipation of these effects is obvious.

### G. The Opinion Letter of the Department of Justice

In construing the ambiguous language within § 307(c)(1), the Court must also give serious consideration to the opinion letter written by the Department of Justice on April 20, 1979. Ex. L–A. *Cf. Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1974). The Department of Interior, charged with administering leasing activities in the OCS, and the Department of Commerce, responsible for the approval of state coastal management programs under the CZMA, disagreed as to the applicability of the consistency requirements of § 307(c)(1) to the OCS pre-leasing activities of the Secretary of the Interior. In its opinion letter, the Department of Justice expressly repudiated Interior's contention that its pre-lease activities were *per se* exempt from the consistency requirement of § 307(c)(1). After analyzing the legislative history, the interrelationship of two of the consistency provisions, and the significance of subsequent legislation concerning the OCS, the Department of Justice concluded that "pre-leasing activities of the Secretary of Interior are subject to the conformity requirement of § 307(c)(1)". Ex. L–A at 13. Thus, the opinion lends further support to the Court's interpretation of the scope of the requirement in light of the legislative history and purpose of the statute.

■ The opinion letter does not attempt to resolve the problem of the proper definition of the phrase "directly affects". How-ever, it does reject the substitution of the term "significantly" for the statutory term "directly". In the view of the Department of Justice, the legislative history does not justify this substitution. The Court concurs in this view.

The opinion did not reach the question whether the particular lease sale out of which the dispute arose [17] did directly affect the coastal zone. According to the Department of Justice, the question whether particular pre-leasing activities affect the coastal zone is one of fact and thus the Department was not authorized to answer the question. Ex. L–A.

### H. The Direct Effects of Lease Sale No. 53

■ Although the Court is convinced that a final notice of lease sale would invariably directly affect the coastal zone in all but the most unusual case—a case which probably could only be posed as a hypothetical—it declines to hold that the final notice of lease sale is a generic category of federal activity which directly affects the coastal zone within the meaning of 307(c)(1). The Court agrees with the Justice Department that the determination as to whether the final notice of lease sale directly affects the coastal zone must be made on a case-by-case basis.

On these facts, the Court has no difficulty in finding such a direct effect. There is ample evidence within the administrative record that the Notice of Lease Sale No. 53 directly affects the coastal zone and, thus, satisfies the threshold test under § 307 of the CZMA.

For example, a reading of the notice itself reveals some of the many consequences of leasing upon the coastal zone. The "Notice of Oil and Gas Lease Sale No. 53 (Partial Offering)", as published in the Federal Register,[18] announced ten stipulations to be applied to federal lessees. The activities

**17.** The dispute arose out of Lease Sale No. 48 involving 148 OCS tracts off southern California. The lease sale was held on June 29, 1979. Ex. L–27 (Summary of Mediation Conference between California and the Department of Interior, Oct. 19, 1979); Ex. L–7 (Mediator's Memo-randum for the Secretary of Commerce, Jan. 25, 1980); *see also* Linsley, *supra* note 2 at 454–461.

**18.** 46 Fed.Reg. 23674 (1981), Ex. L–4.

permitted and/or required by the stipulations result in direct effects upon the coastal zone. Stipulation No. 4 sets forth the conditions for operation of boats and aircraft by lessees. Stipulation No. 6 states the conditions under which pipelines will be required; the Department of Interior, as lessor, specifically reserves the right to regulate the placement of "any pipeline used for transporting production to shore". Lessees must agree, pursuant to Stipulation No. 1, to preserve and protect biological resources discovered during the conduct of operations on the leased area.

The Secretarial Issue Document ("SID"), prepared in October 1980 by the Department of Interior to aid the Secretary in his decision, contains voluminous information indicative of the direct effects of this project on the coastal zone. For instance, the SID contains a table showing the overall probability of an oilspill impacting a point within the sea otter range during the life of the project in the northern portion of the Santa Maria Basin to be 52%.[19] Both the SID and the EIS contain statistics showing the likelihood of oilspills during the life of the leases; based on the unrevised USGS estimates, 1.65 spills are expected during the project conducted in the Santa Maria subarea. *See* SID at 190; *see also* EIS at 4–1 to 4–16. According to the SID, the probability of an oilspill is even higher when the revised USGS figures are utilized.

In addition, both the SID and the EIS list a multitude of impacts arising out of the operations in the leasing area of Lease Sale No. 3. The EIS, prepared by the BLM at the request of the Department of the Interior, includes a section entitled "Unavoidable Adverse Impacts"; the SID discusses the same factors under the caption "Multiple-Use Conflicts". Disregarding the titles, the information contained in these sections is indicative of the consequences flowing from the Notice of Lease Sale 53 to the coastal zone. Both documents refer to impacts upon air and water quality, marine and coastal ecosystems, commercial fisheries, recreation and sportfishing, navigation, cultural resources, and socio-economic factors. EIS at 4–183 to 4–186; SID 80–132. For instance, the EIS states that "[n]ormal offshore operations would have unavoidable effects . . . on the quality of the surrounding water". Pipelaying, drilling, and construction, chronic spills from platforms, and the discharge of treated sewage contribute to the degradation of water quality in the area. EIS at 4–183. As to commercial fisheries, drilling muds and cuttings "could significantly affect fish and invertebrate populations"; the spot prawn fishery in the Santa Maria Basin is particularly vulnerable to this physical disruption. EIS at 4–184. In reference to recreation and sportfishing, the EIS indicates the possibility of adverse impacts as a result of the competition for land between recreation and OCS-related onshore facilities as a result of temporary disruption of recreation areas caused by pipeline burial. EIS at 4–184 to 4–185. There are the additional risks of "the degradation of the aesthetic environment conducive to recreation and the damage to recreational sites as a result of an oil spill". EIS at 4–185. Another impact on the coastal zone will occur as a result of the migration of labor into the area during the early years of oil and gas operations. EIS at 4–185. Impacts on the level of employment and the size of the population in the coastal region are also predicted. EIS at 4–54.

The SID notes that there are artifacts of historic interest as well as aboriginal archaeological sites reported in the area of the Santa Maria tracts. SID at 119. The FWS and NMFS biological opinions, appended to the SID, indicate the likelihood that development and production activities may jeopardize the existence of the southern sea otter and the gray whale. SID at 146.

---

**19.** *See* Table 3 in FWS letter of September 18, 1980, appended to SID, Ex. L–C at 205. This figure represents the overall probability that one or more oilspills of 1,000 barrels or more will occur during the lifetime of the project and impact designated targets within 30 days. The FWS considers the data concerning the impact upon the sea otter range within 30 days to be the "primary data that should be considered when assessing possible effects on sea otters". Ex. L–C at 189.

These effects constitute only a partial list. Further enumeration is unnecessary. The threshold test under § 307(c)(1) would in fact be satisfied by a finding of a single direct effect upon the coastal zone. Although the evidence of direct effects is substantial, such a showing is not required by the CZMA. It is manifest that a consistency review is required in this case.

III. NEPA

Plaintiffs also seek to enjoin the leasing of tracts in the northern portion of the Santa Maria Basin on the basis of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4331 et seq. They allege that defendants have failed to comply with § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), which requires federal agencies to prepare and to circulate an environmental impact statement ("EIS") for major federal actions significantly affecting the quality of the human environment. Plaintiffs challenge the adequacy of the EIS prepared for Lease Sale No. 53 because the EIS failed to incorporate the most recent estimates of oil and gas reserves in the basin. Due to the alleged failure of the EIS to consider the newest data concerning the estimated hydrocarbon reserves, plaintiffs contend that a supplemental EIS is required by NEPA.

In September 1980, the final EIS on Lease Sale No. 53 was released by the Bureau of Land Management ("BLM"). The evaluation of environmental effects of Lease Sale No. 53 was based upon existing estimates of recoverable oil and gas resources, provided by the United States Geological Survey ("USGS"), Conservation Division, Los Angeles, California. At page xii of the EIS is an Addendum which presents the revised estimates of oil and gas resources for the five basins involved in Lease Sale No. 53, as of August 28, 1980. The expected recoverable resources were found to be "roughly twice the amount assumed in the draft and final EIS analyses". EIS at xii. The evaluations in the body of the EIS are based upon the original USGS estimates of reserves, rather than on the more recent statistics. A Secretary Issue Document ("SID"), prepared in October 1980 for then

Secretary Andrus did, however, incorporate the revised USGS estimates.

The central issue to be resolved is whether the EIS filed by the BLM concerning proposed Lease Sale No. 53 was adequate according to procedures set forth in the National Environmental Protection Act. In evaluating the procedural adequacy of the EIS, the Court is guided by the standard adopted by this circuit:

[A]n EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information. [Citation omitted]

Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 592 (9th Cir. 1981). The adequacy of the content of the EIS is determined by a rule of reason, which requires only "[a] reasonably thorough discussion of the significant aspects of the probable environmental consequences". Id., quoting Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). As the Ninth Circuit has cautioned, there is no per se rule requiring the inclusion of every potentially significant statistic. See Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1217 (9th Cir. 1979). Rather, "the test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all foreseeable environmental consequences". Columbia Basin Land Protection Association v. Schlesinger, supra at 592, quoting Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam ).

The sole procedural defect of which plaintiffs complain is the failure of defendants to incorporate the USGS revised estimates in the discussion of environmental effects in the EIS. At the outset, it must be noted

that defendants did not completely ignore the new estimates. The revised USGS estimates were clearly presented in an addendum at p. xii which preceded the main body of the EIS. Thus, it cannot be said that this information was not made available to the public.

Also, the EIS did point out the "high degree of uncertainty regarding the level of oil and gas reserves which might be present". EIS 1–12. The unrevised USGS estimate which predicts an initial yield of 400 million barrels for the Santa Maria Basin, is described as a "conditional probability". EIS 1–9, 1–11. Thus, the EIS does not disguise the fact that estimates of oil reserves, which form the basis of the predictions of a variety of environmental impacts, are "inherently speculative". EIS 1–13. Thus, this preliminary explanation of the reliability of estimates of hydrocarbon reserves serves as evidence of a "good faith attempt" to discuss foreseeable environmental consequences.

■ Perhaps, as plaintiffs suggest, detailed analysis of this new data, incorporated in the body of the EIS, would be more effective in informing the public of the potential risk posed to the environment. However, the format selected for the presentation of the information is left to the discretion of the federal agency. The Court's role is to ensure that the agency has taken a "hard look" at the environmental consequences, *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), and not to prescribe in detail the method by which the agency conveys this information to the public.

■ Assuming for the purpose of argument that the EIS was inadequate, according to the procedures set forth in NEPA, defendants argue that the SID has cured this alleged inadequacy. The SID, prepared a month after the EIS, presented the revised USGS figures and analyzed certain environmental impacts on the basis of the current estimates. SID at 1, 59. While the SID comments that the revised USGS estimates, which "indicate significantly higher resources for oil and gas", result in "higher environmental cost estimates", *Id.* at 1, it is

not clear that the SID's limited analysis of the revised figures sufficiently clarifies the issues raised by the prediction doubling the estimated hydrocarbon reserves. Nevertheless, the Court need not reach the question whether the SID alone would cure the alleged defect. Although the SID may not be sufficient in itself to remedy the omission of significant data, the document is likely to be helpful as a complement to the EIS by interpreting or clarifying issues raised in the EIS. *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C.Cir.1980).

■ Under the facts of this case, the Department of Interior's actions in filing the EIS with an addendum presenting the newly revised estimates of hydrocarbon reserves, in addition to preparing an SID which analyzes certain impacts in light of the new data, comport with NEPA. Due to the high degree of uncertainty regarding the estimates of hydrocarbon reserves in the Santa Maria Basin, the decision of the Department of Interior not to file a supplement or to revise the existing EIS in the few days remaining before publication is not unreasonable. The Court concludes that "although the EIS could be 'improved by hindsight,' it has satisfied the intent" of NEPA. *Cady v. Morton*, 527 F.2d 786, 797 (9th Cir. 1975), quoting *National Forest Preservation Group v. Butz*, 485 F.2d 408, 412 (9th Cir. 1973).

## IV. SECTION 19 OF THE OUTER CONTINENTAL SHELF LANDS ACT

A third claim for injunctive and declaratory relief is premised on the Secretary's alleged violation of § 19 of the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1345. Section 19 provides that the governor of an affected state may submit recommendations to the Secretary regarding the size, time or location of a proposed lease sale, 43 U.S.C. § 1345(a), and that the Secretary is required to accept the governor's recommendations "if he determines . . . that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State". 43 U.S.C. § 1345(c). Plaintiffs con-

tend that the Secretary's decision to reject Governor Brown's recommendation to delete the tracts in dispute from Lease Sale No. 53 fails to comply with § 19. According to plaintiffs, since the Governor's recommendation provided for a "reasonable balance" as required by § 19, the Secretary was obligated to accept the recommendation.

In deciding whether the Secretary's decision to proceed with Lease Sale No. 53 complies with § 19 of OCSLA, the scope of the court's inquiry is limited by the deferential standard of review applicable to this determination. *See, e. g., Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1 (D.C.Cir.1976). The statute itself provides that the Secretary's acceptance or rejection of such recommendations shall be final, "unless found to be arbitrary or capricious". 43 U.S.C. § 1345(d). In determining whether the Secretary's rejection of the Governor's recommendations was arbitrary or capricious, the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), quoted in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Washington State Farm Bureau v. Marshall*, 625 F.2d 296 (9th Cir. 1980). The Court may not substitute its judgment for that of the agency.

In the present case, the record shows that the Secretary did undertake an examination of the balance between the interests at stake in Lease Sale No. 53. In a letter subsequently mailed to the Governor, the Secretary described the mode of analysis employed in the Secretary's balancing process. Defendants' Ex. L–P (letter from Secretary Watt to Governor Brown, dated May 1, 1981). This explanation indicates that the Secretary evaluated such "quantifiable factors" as income from resource development and expected monetary losses due to oil spills. Factors which, in the Secretary's view, were "not quantifiable", including damage to wildlife, decline in water quality, and "aesthetic and lifestyle losses", were given only cursory consideration. A thorough evaluation of all relevant factors through more sophisticated analytical techniques would certainly have been desirable, but within wide limits, the final decision as to the type of analysis which is appropriate in view of the available data must be the agency's, subject to review only for obvious errors of methodology. *Massachusetts v. Andrus*, 594 F.2d 872, 886 (1st Cir. 1979). Under the applicable standard of review, the Court cannot conclude that there has been a clear error of judgment.

The Secretary's mode of analysis must also be considered in light of the fact that OCSLA provides little or no guidance as to the proper basis for the Secretary's evaluation of a governor's recommendation. In deciding whether to accept or reject the Governor's recommendation, the Secretary must determine whether it provides for a "reasonable balance" of two key factors— the "national interest" and the "well-being of the citizens of the affected State". 43 U.S.C. § 1345(c). Section 19 requires that the determination of the "national interest" be based on "the desirability of obtaining oil and gas supplies in a balanced manner", but provides no basis for evaluating the citizens' well-being. *Id.*

Nevertheless, the fact that the statute fails to provide explicit guidance will not excuse the absence of reasoned analysis of all considerations specified within the Act. The Court has a responsibility to scrutinize an agency's judgment as to the proper balance to be struck between conflicting interests. *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Here, the Secretary's extremely limited consideration of one of two potentially conflicting interests, the "well-being of the citizens of the affected State", barely suffices to meet plaintiffs' challenge.

Plaintiffs also point to purported procedural flaws in the Secretary's determination pursuant to § 19. First, plaintiffs complain of a lack of opportunity for consultation. The statute imposes the responsibility on the Secretary for the provision of such an opportunity. 43 U.S.C. § 1345(c).

However, the timing of the opportunity and the mode of making consultation available is within the Secretary's discretion. The record indicates the existence of limited formal correspondence between the parties, including Governor Brown's letter of December 24, 1980, and Secretary Watt's letter of February 10, 1981. Although minimal communication in writing is not conducive to meaningful consultation between the Secretary and the Governor, it nevertheless meets the bare technical requirements of the statute. In sum, there is an insufficient basis for the conclusion that the Secretary arbitrarily and capriciously deprived the Governor of further opportunities for consultation.

■ A second alleged procedural flaw relates to the requirement that the Secretary communicate to the Governor in writing his reasons for rejecting the recommendation. 43 U.S.C. § 1345(c). The Secretary's letter to Governor Brown, dated May 1, satisfies this requirement. The statute does not require that the written explanation be provided prior to the Secretary's announcement of his decision to proceed with the lease sale. Although the provision of a timely explanation is likely to be more effective in implementing the statutory policy of insuring governors of affected states a "leading role in OCS decisions",[20] H.Conf. Rep. 95–1474, 95th Cong., 2d Sess. 106, *reprinted in* [1978] U.S.Code Cong. & Ad. News 1674; H.R.Rep. 95–590, 95th Cong., 2d Sess. 152, *reprinted in* [1978] U.S.Code Cong. & Ad.News 1558, the Court cannot substitute its judgment for that of Congress by imposing a requirement concerning the timing of the explanation.

■ There is one further aspect of the timing of the explanation which requires comment. Because the Secretary's reasons for his decision were committed to writing 21 days after the announcement of the decision and 2 days after this suit was filed alleging a failure to provide an adequate rationale for the rejection of the Governor's recommendation, the Secretary's explanation is subject to the inherent danger of "*post hoc* rationalization". *See Overton Park v. Volpe, supra*, 401 U.S. at 419–20, 91 S.Ct. at 825; *American Petroleum Institute v. Knecht, supra*, at 908–9. An explanation which takes on the aspect of a litigation affidavit must, of course, be viewed critically. *Id.* However, the danger presented by *post hoc* explanations may be less where, as here, the announced agency decision was accompanied by a contemporaneous explanation of some of the considerations that formed a basis of the decision,[21] and where the administrative record lends some support to the explanation. *See Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (*per curiam*). That is the best that can be said for the Secretary's timing.

■ Taking into consideration all of the foregoing factors, the Court must conclude that the Secretary has complied, although minimally, with the necessary procedural requirements under § 19 of OCSLA. 43 U.S.C. § 1345. Although the Secretary quite clearly violated the spirit of the Act, giving due deference to his judgment, it

---

**20.** Section 19 is "intended to insure that Governors of affected States, and local government executives within such States, have a leading role in OCS decisions and particularly as to lease sales and development and production plans. In addition, it is intended to provide a mechanism for involvement of Governors and local government officials". H.Rep. 95–590, 95th Cong., 2d Sess. 152, *reprinted in* [1978] U.S.Code Cong. & Ad.News 1558.

**21.** On April 10, 1981 at 10:00 a. m., the Department of Interior issued a news release, discussing generally the accelerated five-year offshore leasing plan proposed by the Department of Interior. Included in the New Release is a brief discussion of Lease Sale No. 53, in which some

of the interests "balanced" by the Secretary are noted.

Defendants have questioned the propriety of considering information contained in documents which do not form a part of the administrative record. The Ninth Circuit has concluded that where the court finds it necessary to go outside the administrative record, it may consider such evidence "to ascertain whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision". *Asarco, Inc. v. EPA*, 616 F.2d 1153 (9th Cir. 1980). Under this analysis, it is proper to consider the press release in evaluating the danger of *post hoc* rationalization in the Secretary's course of action, described *supra*.

cannot be said that his determination to reject the recommendation submitted by Governor Brown was legally "arbitrary and capricious".

## V. ENDANGERED SPECIES ACT

As a fourth ground of relief, plaintiffs allege that defendants have violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., which directs federal agencies "to conserve endangered and threatened species". 16 U.S.C. § 1531(c). Section 7(a) of the Act requires each federal agency to "insure" that an action by that agency "does not jeopardize the existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). In order to facilitate compliance with this requirement, the Act imposes on the Secretary and any agency whose actions may affect an endangered or threatened species the duty of "consultation".[22] Section 7(c)(1), 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.04 (1980). Section 7(c)(1) provides:

> To facilitate compliance with the requirements of subsection (a)(2) of this section, each Federal agency shall . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

In fulfilling the consultation requirement of Section 7(c), the agency is required to "use the best scientific . . . data available". Id.

During April of 1980, the BLM requested biological opinions from the two federal agencies with jurisdiction over the marine animals which it had determined were likely to be affected by the proposed lease sale. In response to this request, the National Marine and Fisheries Service ("NMFS")

prepared a biological opinion on the impact of the lease sale on various species of whales and sea turtles, and the Fish and Wildlife Service ("FWS") prepared a biological opinion on the impact of the lease sale on the southern sea otter and other species of wildlife. Ex. L–5 (FWS Opinion), Ex. L–6 (NMFS Opinion). Both opinions concluded that the proposed lease sale and exploration activities associated with Lease Sale No. 53 were not likely to jeopardize any endangered or threatened species. Id.

Plaintiffs challenge the adequacy of the two biological opinions. First, plaintiffs claim that, in failing to reappraise the risks posed by leasing activities and exploratory drilling in light of the revised USGS resource estimates, defendants have not employed "the best scientific data available". Secondly, according to plaintiffs, biological opinions which fail to evaluate the risks at the development and production stages cannot provide an adequate basis for a finding of no jeopardy.

The short answer to plaintiffs' expressed concern that defendants did not utilize the newest information as to the revised oil reserve estimates is simply that the agencies which prepared the biological opinions did evaluate the risks posed to endangered or threatened species in light of that data. The FWS opinion discussed the significance of the revised USGS resource estimates in its analysis of the cumulative effects upon sea otters as the result of an oil spill, and explicitly stated that its findings were based on "the new oilspill analysis data of August 28, 1980". Ex. L–5 at 9–11. The NMFS opinion was drafted before the NMFS became aware of the revised estimates of hydrocarbon potential. However, upon consideration of the revised estimates, the NMFS concluded that there was "no increased risk to marine mammals and endangered species" during the leasing and exploration stages and, therefore, no modification of the biological opinion prepared

---

22. The implementing regulations under § 7 of ESA provide for formal consultation with one or both of two agencies which share responsibilities under the ESA; these agencies are the

United States Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"). 50 C.F.R. §§ 402.01, 402.04.

for Lease Sale No. 53 was required. Declaration of James H. Lecky.[23]

■ Any question as to the extent of the consideration given the revised resource estimates is beyond the proper scope of review. *See, e. g., Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823. Since there is evidence of consideration of the new USGS data, the Court must conclude that the consultation was based upon the "best scientific information available" as required by § 7 of ESA.

■ The potential risks that may be incurred during the development and production phases were not ignored during the consultation process. In fact, the FWS opinion acknowledges that potential development/production-related facilities could have an effect on endangered and threatened species. Ex. L–5 at 3. Since the specific location, nature, and size of facilities that might be necessary during these phases is not yet known, the potential jeopardy to the endangered species posed by these subsequent phases of OCS development was not determined. *Id.;* Ex. L–6 at 4. Both opinions indicated, however, the necessity of reinitiation of consultation pursuant to § 7 of ESA prior to approval of development/production plans. *Id.* In light of the restrictions imposed on the FWS and the NMFS by the limited quantity of available information, the decision to evaluate only the risks incurred during leasing and exploration and to reinitiate consultation prior to development and production cannot be held unreasonable. *See North Slope v. Andrus, supra,* at 606–609, and *Conservation Law Foundation v. Andrus,* 623 F.2d 712, 715 nn. 2–3, 14 [BNA] E.R.C. 1049, 1050–51 and nn. 2–3 (1st Cir. 1979); *but see Hill v. TVA,* 549 F.2d 1064, 1070–72 (6th Cir. 1977), *aff'd* 437 U.S. 153, 98 S.Ct. 478, 54 L.Ed.2d 312 (1978).

■ Plaintiffs allege a violation of another section of the ESA, § 7(d), which provides that a federal agency "shall make no irreversible or irretrievable commitment of resources ... which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would avoid jeopardizing the existence of any endangered or threatened species. 16 U.S.C. § 1536(d). Plaintiffs have not demonstrated that such an irreversible or irretrievable commitment of resources has occurred as a result of the activities thus far approved during § 7 consultation. Although not yet addressed by the Ninth Circuit, two other circuits have rejected similar arguments to the effect that an OCS sale constitutes an "irreversible or irretrievable commitment of resources" within the meaning of § 7(d). *North Slope v. Andrus, supra; Conservation Law Foundation v. Andrus, supra.*

## VI. "TAKING" UNDER § 9 OF THE ENDANGERED SPECIES ACT AND UNDER THE MARINE MAMMAL PROTECTION ACT

Plaintiffs' final claim arises under § 9 of ESA, 16 U.S.C. § 1538, and under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.* They argue that a "taking" under § 9 of ESA and under the MMPA will result from the leasing of tracts in the northern Santa Maria Basin. The defendants' activities relating to Lease Sale No. 53 are not encompassed by the prohibitions of either § 9 of ESA or the MMPA.

■ The language of the statutes provides no support for plaintiffs' arguments. The statutes forbid any person to "take" any marine mammal or endangered species of fish or wildlife from waters within the jurisdiction of the United States. 16 U.S.C. § 1372(a)(1); 16 U.S.C. § 1538(a)(1). Assuming *arguendo* that the proposed leasing activities do constitute a threat to the continued survival of species protected by these statutes, such a threat would still not constitute a "taking" under the statutes. ESA defines the term "take" as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt

---

**23.** James H. Lecky, as Marine Mammal and Endangered Species Coordinator for the Southwest Region, NMFS, was responsible for the preparation of the biological opinion which NMFS submitted to BLM on September 17, 1980.

to engage in any such conduct". 16 U.S.C. § 1532(19). Thus, in prohibiting "taking", the draftsmen of the statutes envisioned a more immediate injury. *Cf. Palila v. Hawaii Dept. of Land & Natural Resources*, 471 F.Supp. 985 (D.Hawaii 1979). A review of the record reveals no clear showing of such harm, attempted harm, or harassment[24] as is required by the statutes. Plaintiffs have not demonstrated that defendants' activities relating to Lease Sale No. 53 are encompassed by § 9 of ESA or by the MMPA.

## VII. THE PROPER SCOPE OF ANALYSIS UNDER ESA, THE MMPA AND THE CZMA

A question common to three of the statutes relied upon by plaintiffs—ESA, the MMPA and the CZMA—is whether the Court should focus on a discrete stage of a multistage OCS project designed to exploit and develop the mineral resources of the OCS or whether the Court should examine the project as a continuum of planned events. That is, in analyzing plaintiffs' claims under the different environmental statutes, should the Court look at Lease Sale No. 53 merely as the first discrete link in the chain or should the Court consider the lease sale by reference to the complete chain of events which it initiates? The answer to this question cannot be the same for all of the statutes involved here. To determine the proper scope of analysis, the Court must look to the policy behind the statute.

 The CZMA, as discussed *supra*, is intended to further the development and implementation of comprehensive management programs for the coastal area. The needs of present and future generations are to be considered during the planning process envisioned by Congress. Under the CZMA, a myopic view of an isolated phase of a multistage project would be inappropriate. The decision-makers must integrate the full panoply of possibilities into a comprehensive plan. Thus, the states and the federal agencies must consider long-term effects as well as immediate effects in order to manage the coastal zone effectively. It would be unrealistic to declare that the goal of Lease Sale No. 53 is merely leasing tracts and not "pumping oil". *See North Slope Borough v. Andrus, supra*, at 608. The CZMA requires an evaluation of the consequences of the lease sale as well as the resulting activities occurring as a result of the notice of sale.

 In contrast, ESA and the MMPA have a narrower focus. ESA, like the CZMA, is intended to serve the goal of preservation of fragile environmental resources. In the case of ESA, the protected resource is the species threatened with extinction, whereas, under the CZMA, all coastal resources are to be protected to accomplish the goal of preservation. ESA relies on different means from those of the CZMA. ESA does not focus on comprehensive planning. Instead, it prescribes safeguards, such as specific prohibitions on particular acts, such as killing or wounding an endangered species of fish or wildlife. *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir. 1976). Under ESA, the Secretary is required to make individual determinations as events arise concerning the risk posed to a threatened or endangered species by a particular action. It may not be feasible to prescribe the proper safeguards until the discrete stage is at hand. Thus, a more limited focus is appropriate under ESA. The same distinction applies to the MMPA as opposed to the CZMA. The MMPA prescribes specific safeguards in order to prevent imminent harm or harassment of marine mammals; it provides restrictions on the "taking" and importing of certain species of marine mammals, and provides for enforcement of the restrictions. 16 U.S.C. §§ 1371–1377. A focus on a discrete stage of activity is also appropriate to effectuate the purpose of the MMPA just as it is with respect to the ESA. In sum, in this case, an examination of the threat posed by specific

---

**24.** The regulations of the Fish and Wildlife Service further define "harass" as "an intentional or negligent act or omission ... annoying wildlife to such an extent as to significantly disrupt normal behavior patterns ...." 50 C.F.R. § 17.3. There is no evidence in the record to support such a finding of harassment.

activities at the time the immediate threat is posed will carry out the objectives of the MMPA and ESA.

## CONCLUSION

Plaintiffs are entitled to injunctive and declaratory relief on their claims under the CZMA. As to the remaining claims raised in the Complaint, defendants are entitled to judgment as a matter of law.

This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

## ORDER AND SUMMARY JUDGMENT

The parties' cross-motions for summary judgment, pursuant to Fed.R.Civ.P. 56, and defendant-intervenors' motion for summary judgment, or, in the alternative, motion to dismiss the complaints of Natural Resources Defense Council, *et al.*, and of the County of Humboldt, *et al.*, pursuant to Fed.R. Civ.P. 12(b)(6), came on for hearing before the Honorable Mariana R. Pfaelzer on July 10, 1981. All parties appeared by and through their respective counsel of record. Having reviewed and considered the administrative record and the memoranda, affidavits, and exhibits filed by the parties, and having heard and considered the oral arguments of counsel, and having taken the matter under submission, the Court has incorporated its Findings of Fact and Conclusions of Law in the Opinion filed herewith. Accordingly,

IT IS ORDERED, ADJUDGED AND DECREED that:

1. Plaintiffs' Motion for Summary Judgment in CV 81–2080, with respect to the claim arising under the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, is granted. Defendants' Motion for Summary Judgment with respect to plaintiffs' claim arising under the Coastal Zone Management Act is denied.

2. Defendants' decision to lease Tracts 129 to 142, 144 to 146, 148 to 155 and 158 to 161 in the northern portion of the Santa Maria Basin for oil and gas development was made in violation of the Coastal Zone Management Act.

3. Any bids received for the tracts at issue are declared null and void and the

monies posted shall be returned to the bidders.

4. Any oil and gas leases for any of the tracts at issue herein awarded as part of Lease Sale No. 53 are declared null and void.

5. Defendants and defendant-intervenors, their officers, agents, employees, representatives, and all persons acting in concert with them, are hereby enjoined from awarding, approving or taking any action or allowing others to take any action pursuant to any leases for any of the tracts at issue, until such time as defendants comply with the requirements of the Coastal Zone Management Act by conducting a consistency determination on the tracts at issue and by conducting all activities on these tracts in a manner consistent with California's Coastal Management Plan.

6. Defendants' Motion for Summary Judgment in CV 81–2080 with respect to plaintiffs' claims arising under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*, the National Environmental Protection Act, 42 U.S.C. §§ 4321 *et seq.*, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.*, is granted. Plaintiffs' Motion for Summary Judgment in CV 81–2080 with respect to the claims arising under these statutes is denied.

7. Defendant-intervenors' Motion to Dismiss Plaintiffs, Natural Resources Defense Council, *et al.*, in CV 81–2081 pursuant to Fed.R.Civ.P. 12(b)(6) is granted.

8. Defendant-intervenors' Motion to Dismiss Plaintiff-intervenors, County of Humboldt, *et al.*, in CV 81–2080 pursuant to Fed.R.Civ.P. 12(b)(6) is denied.

9. Each party shall bear its own costs.

10. Judgment is hereby entered.

The Court shall retain continuing jurisdiction over this case to ensure compliance with this Order.